UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br>100 F STREET, N.E.<br>WASHINGTON, DC 20549,<br><br>PLAINTIFF,<br><br>v.<br><br><br>MICHAEL ANDRE JONES,<br>6530 67th PLACE NE<br>MARYSVILLE, WA 98270,<br><br>DEFENDANT. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Plaintiff, the United States Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY**

1.      This case involves violations of the anti-fraud, securities registration, and broker-dealer registration provisions of the federal securities laws by defendant Michael Andre Jones ("Jones").  Jones employed a scheme to trick investors into buying unregistered securities issued by a start-up company named Green Bash, LLC ("Green Bash") for which he was the sole shareholder and director.  Green Bash is now defunct.  Jones offered and sold more than $700,000 worth of Green Bash convertible promissory notes to twenty investors, residing in twelve states.  The offering was not registered with the Commission, and did not qualify for an exemption from registration.  Jones made false statements to prospective investors regarding Green Bash's revenues and business operations and made material misrepresentations about the offering.   Jones acted as an unregistered broker when making Green Bash offers and sales to

investors.  After concluding the sales of the notes, Jones sold two investors restricted stock in a small unrelated biotechnology company.  However, when Jones was unable to obtain an opinion letter lifting the restriction on his shares, he simply kept the shares and the funds investors had paid him for his shares.

2.     By engaging in the conduct set forth in this Complaint, defendant Jones violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

3.     The Commission seeks an injunction against future violations, a conduct-based injunction, disgorgement of unjust enrichment with prejudgment interest thereon, and a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**JURISDICTION**

4.     The Court has jurisdiction over this action pursuant to Sections 20(b) and 20(c) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(c)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)].

5.     Jones, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails, in connection with the conduct alleged herein.

**DEFENDANT**

6.     Michael Andre Jones, age 52, is a citizen of the United States and presently resides in Marysville, Washington.   He is currently employed as a uniform salesman.   From April of 2010 through July of 2013, Jones was the sole shareholder and director of Green Bash.

Prior to the conduct described herein, Jones was associated with a number of broker-dealers registered with the Commission, but was subsequently barred in 2007 by the National Association of Securities Dealers ("NASD") from association with any NASD member firm.

## RELEVANT ENTITY

7.    Green Bash, LLC is a New Mexico limited liability company with its principal offices in Los Angeles, California. Jones is the sole shareholder and director of the company. Green Bash's securities offering was not registered with the Commission. Green Bash was purportedly in the business of arranging and promoting "event after-parties" and making sales of tickets, music, and related merchandise for environmentally themed trade shows. Green Bash ceased operations in July 2013 and has no assets or revenue.

## FACTUAL ALLEGATIONS

8.    From at least April of 2010 through July of 2013, Jones sold convertible promissory notes of Green Bash to 20 different investors living in 12 different states. The sales totaled at least $706,145, and the proceeds were deposited into a bank account that Jones opened and controlled for Green Bash, and for which he was the sole signatory. The Green Bash bank account was regularly overdrawn, and Green Bash accumulated more than $28,000 in returned item and overdrawn bank fees over the approximately three-year life of the account. After several months of inactivity, the bank closed the account.

9.    Jones hired and compensated individuals to solicit potential investors for Green Bash.

10.    Jones purchased at least one list of potential investors and used the information from the list to solicit investors for his sales of Green Bash's promissory notes. Jones, and

individuals he hired, contacted approximately 2,000 persons in his efforts to sell the Green Bash notes.

11.     Jones created telephone scripts that he directed the individuals he hired to use for their initial "cold" calls to potential investors.  He also created a "closing script" that he used to close sales of Green Bash notes to investors.

12.     Jones used telephone calls to offer and sell the Green Bash notes.  During closing calls, Jones directed potential investors to a website that he used to give potential investors the impression that he was part of a vibrant investment firm with several active and lucrative funding initiatives in progress.  The website purported to set forth multiple private placement deals that the firm was working on.  In reality, apart from Jones, there was no such firm, and the only business Jones was conducting was the sale of Green Bash promissory notes.

13.     Jones drafted a Private Placement Memorandum ("PPM") that he sent to each Green Bash investor.   The PPM described the offering of Green Bash securities and gave detailed information about Green Bash's purported business operations, along with unsubstantiated projections for its future performance.

14.     Jones used the mails and commercial delivery services to send the PPM and subscription agreements to Green Bash investors.  Jones created and mailed, or used commercial delivery services to deliver, certificates evidencing the purchase of Green Bash notes.

15.     Jones never filed a registration statement with the Commission for the offering of Green Bash notes.  The PPM described the offering of Green Bash notes as exempt from the registration requirements of the federal securities laws.  In fact, the offering did not qualify for the claimed exemption, principally because Jones used his purchased investor list to solicit investors with whom he had no prior dealings, thereby conducting a general solicitation.  Thus

the Green Bash notes offering was not registered with the Commission and no exemption from registration applied to the offering.

16.     The PPM contained a number of material false statements regarding the operations and revenue of Green Bash. Jones drafted these false statements, knowingly or recklessly disregarding that they were false at the time he wrote them, and knowingly or recklessly disregarding that they were false when he transmitted them to prospective Green Bash note purchasers.

17.     The PPM contained revenue projections for Green Bash of $898,000 in year one, $2,199,796 in year two, and $4,300,087 in year three. Jones had no reasonable basis for these projections when he made them. Moreover, Jones never updated these projections, despite the fact that Green Bash had no revenue in 2010, and continued to use the unchanged PPM throughout the sales period.

18.     Jones started selling Green Bash notes in April of 2010, and by April of 2011, he had sold at least $145,600 worth of notes. Jones had sold more than $700,000 worth of Green Bash notes by July of 2013.

19.     The PPM identified six Green Bash revenue streams: sales of tickets, music, and merchandise, and three forms of website-generated revenue. None of these revenue streams actually existed.

20.     The PPM described Green Bash as conducting a business that arranged and promoted "event after-parties" by utilizing a "viral e-commerce" online platform at concert venues, facilitating "one-click" sales of tickets, music, and merchandise. Purportedly, concertgoers would thereby avoid the complexities and inconvenience of attempting to navigate several internet pages on a mobile device in order to make purchases. In reality, Green Bash was

not using the "viral e-commerce" online platform, and it generated no revenue.  Green Bash never made any sales of music or merchandise.  Green Bash never generated revenue from operations of any kind.

21.    Jones also misrepresented the size of the Green Bash offering to all investors that bought Green Bash notes after November of 2011.  The PPM described the offering as being for a total amount of $350,000, with the issuer having the option to raise an additional $50,000.  In fact, Jones had already sold $350,000 worth of Green Bash notes by November of 2011.  This misrepresentation was material because the Green Bash notes had conversion rights, a fact that Jones touted to potential investors.  Thus, Green Bash investors who purchased after November of 2011 were knowingly or recklessly misled by Jones as to the dilutive effect of the offering.

22.    No Green Bash notes were ever converted to stock.

23.    Jones hired and compensated individuals to solicit potential investors.  Jones handled all of the proceeds of the note sales.  He prepared all of the transaction documents that he sent and received back from investors, and he prepared and issued Green Bash note certificates to investors.  He prepared and mailed, or used delivery services to send, initial account statements to some of the investors.  Jones thus effected transactions in securities for the accounts of others.

24.    Jones used investor proceeds from some Green Bash notes to make some interest payments to earlier Green Bash note purchasers.  The last interest payments he made were in December 2012.  Thereafter, Green Bash defaulted on all of the notes to all of the investors.

25.    One Green Bash investor, after complaining, received a return of approximately one-third of the principal he had invested.   No other Green Bash investor received any return of principal.

26.     Jones dissipated the rest of the Green Bash note proceeds, essentially by paying his rent and otherwise living off of them.

27.     After his sales of Green Bash notes, Jones commenced efforts to sell investors securities of several other start-up entities.   Jones was never actually able to sell any of those securities, although he did form entities, compile preliminary drafts of offering documents, and negotiated with several small businesses in an attempt to reach agreements to raise capital for them.

28.     In the Spring of 2014, Jones worked briefly as a consultant for a small biotechnology company.   The arrangement called for Jones to sell the company's promissory notes through private placements, and he was to be compensated in part with grants of restricted company stock.   However, once he received his initial grant of restricted stock, Jones concentrated his efforts on selling that restricted stock, instead of selling the company's promissory notes.

29.     Jones used telephone calls to offer and sell his restricted stock.   Two investors paid Jones a total of $35,000 for some of the stock.   He received sales proceeds by mail.   Jones was never able to obtain an opinion letter from the company's counsel lifting the restriction on his shares.   Nevertheless, Jones collected the investors' funds, and conveniently kept both his restricted stock and the funds.

30.     When the company discovered that Jones was attempting to sell his own stock, the company terminated his employment.

### COUNT I
**Violations of Section 5 of the Securities Act [15 U.S.C. § 77e]**
**(Unregistered Offering)**

31.     Paragraphs 1 through 30 are realleged and incorporated herein by reference.

32.     Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that it is unlawful for any person, directly or indirectly, to make use of the mails or interstate commerce to sell or deliver any security unless a registration statement is in effect as to that security.

33.     Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides in pertinent part that it is unlawful to make use of interstate commerce or the mails to offer to sell or offer to buy any security, through the use or medium of any prospectus or otherwise, unless a registration statement has been filed as to that security.

34.     As set forth above, Jones made use of telephone calls, the mails, and interstate commerce in his offer and sales of Green Bash notes.

35.     As set forth above, Jones never filed with the Commission a registration statement for the Green Bash offering, the offering was not registered, the offering did not qualify for the exemption from registration Jones claimed in the PPM, and in fact, the offering did not qualify for any exemption from registration.

36.     By reason of the foregoing conduct, Jones violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]**
**(Scheme Liability – Green Bash Notes)**

37.     Paragraphs 1 through 30 are realleged and incorporated herein by reference.

38.     At all relevant times, Section 17(a)(1) of the Securities Act provided in relevant part that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly . . . to employ any device, scheme, or artifice to defraud."
[15 U.S.C. § 77q(a)(1)].

39.     At all relevant times, Section 17(a)(3) of the Securities Act provided in relevant

part that "[i]t shall be unlawful for any person in the offer or sale of any securities. . .by the use

of any means or instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly. . .to engage in any transaction, practice, or course of

business which operates or would operate as a fraud or deceit upon the purchaser." [15 U.S.C.

§ 77q(a)(3)].

40.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule

10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] make it unlawful for any person, directly or

indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or

of any facility of any national securities exchange, to employ any device, scheme, or artifice to

defraud, or to engage in any act, practice, or course of business which operates or would operate

as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

41.     As set forth above, Jones made use of the mails and of interstate commerce, in the

offer and sale of the Green Bash notes.

42.     Jones knowingly or recklessly devised a scheme that included the use of a

purchased list of potential investors, individuals compensated for making initials calls,

misleading statements in telephones scripts, misleading statements in the PPM, and a misleading

website, that together constituted a device, scheme, or artifice to defraud investors, which he

employed in violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)],

Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(a) [ 17 C.F.R. §

240.10b-5(a)].

9

43.    By use of the purchased list of potential investors, individuals compensated for making initial calls, misleading statements in telephone scripts, misleading statements in the PPM, and a misleading website, Jones engaged in transactions, practices, and a course of business that he knew or should have known operated or would operate as a fraud and deceit upon the Green Bash note purchasers, in violation of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

44.    Jones knew, or recklessly disregarded, that those acts, practices, and course of business operated as or would operate as a fraud and deceit upon the Green Bash note purchasers, in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)].

### COUNT III
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)]**
**(Scheme Liability – Jones' Restricted Stock)**

45.    Jones also violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rules 10b-5(a) and (c) through his sales of his restricted stock in a small biotechnology company.

46.    As set forth above, Jones made use of the mails and of interstate commerce in the offer and sale of his restricted stock.

47.    As set forth above, Jones sold his restricted stock to two investors for $35,000, and unable to lift the restriction on the stock, defrauded the investors by keeping both his stock and the investors' funds.  He thereby knowingly or recklessly employed a device, scheme, and artifice to defraud the restricted stock purchasers, in violation of Section 17(a)(1) of the

Securities Act [15 U.S.C. § 77q(a)(1)], Section 10(b) of the Exchange Act [15 U.S.C 78j(b)], and

Exchange Act Rule 10b-5(a) [17 C.F.R. § 240.10b-5(a)].

48.     Through those actions, Jones engaged in transactions, practices, and a course of

business that he knew or should have known operated or would operate as a fraud or deceit upon

the restricted stock purchasers in violation of Section 17(a)(3) of the Securities Act [15 U.S.C. §

77q(a)(3)].

49.     Jones knew or recklessly disregarded that those acts, practices, and a course of

business operated or would operate as a fraud or deceit upon the purchasers in violation of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(c) [17

C.F.R. § 240.10b-5(c)].

**COUNT IV**
**Violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)], Section 10(b) of the**
**Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(b)**
**[17 C.F.R. § 240.10b-5(b)]**
**(Misstatement Liability)**

50.     Paragraphs 1 through 30 are realleged and incorporated herein by reference.

51.     At all relevant times, Section 17(a)(2) of the Securities Act made it unlawful for

"any person in the offer or sale of any securities . . . by the use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, directly or

indirectly . . . to obtain money or property by means of any untrue statement of a material fact or

any omission to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading." [15 U.S.C. § 77q(a)(2)].

52.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule

10b-5(b) [17 C.F.R. § 240.10b-5(b)] made it unlawful for any person, directly or indirectly, by

the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility

of any national securities exchange,  to make any untrue statement of a material fact or to omit to

state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, in connection with the purchase or sale of any

security.

53.     As set forth above, Jones made use of the mails and interstate commerce in the

offer and sale of Green Bash notes.

54.     Jones obtained in excess of $700,000 from investors by means of statements of

material facts in the PPM and in his telephone scripts that he knew or should have known were

untrue, thereby violating  Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

55.     The misstatements in the PPM and in the telephone scripts constituted untrue

statements of material facts regarding Green Bash securities that were made in connection with

the purchase and sale of the Green Bash notes.  Jones knowingly or recklessly made these false

statements of material fact in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Exchange Act Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].


### COUNT V
**Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]**
**(Unregistered Broker)**

56.     Paragraphs 1 through 30 are realleged and incorporated herein by reference.

57.     Exchange Act Section 15(a)(1), in relevant part, makes it unlawful for a "broker"

that is a natural person not associated with a broker or dealer to effect transactions in, or to

induce or attempt to induce the purchase or sale of, any security through the mails or interstate

commerce unless that person is registered with the Commission as a broker [15 U.S.C.

§ 78o(a)(1)].

12

58.     Section 3(a)(4) of the Exchange Act defines a "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others." [15 U.S.C. § 78c(a)(4)].

59.     As set forth above, during the offering and sale of Green Bash securities, Jones, a natural person, was not associated with a broker or dealer registered with the Commission, nor was he himself registered with the Commission as a broker or dealer.

60.     As set forth above, Jones made use of the mails and interstate commerce in his offer and sales of Green Bash securities.

61.     As set forth above, Jones retained and compensated individuals to assist him in effecting the offer and sales of Green Bash securities, collected sales proceeds, generated note certificates and account statements, and was otherwise engaged in the business of effecting transactions in securities for the accounts of others.

62.     By reason of the foregoing, Jones violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

    (a) permanently restrain and enjoin defendant Jones and each of his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice, from violating Section 5 of the Securities Act [15 U.S.C. § 77e];

    (b) permanently restrain and enjoin defendant Jones and each of his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

    (c) permanently restrain and enjoin defendant Jones and each of his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder;

    (d) permanently restrain and enjoin defendant Jones and each of his agents, servants, employees, attorneys, and all persons in active concert or participation with him who receive actual notice, from violating Section 15 of the Exchange Act [15 U.S.C. § 78o];

    (e) permanently restrain and enjoin defendant Jones from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account;

    (f) order defendant Jones to pay disgorgement in the amount of $709,645 plus prejudgment interest in the amount of $77,673;

(g) order defendant Jones to a pay a civil penalty in the amount of $709,645 pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(h) grant such other and further relief as the Court deems appropriate.

Dated August 19, 2016

Respectfully submitted,

Christopher G. Margand (DC Bar #433703)
Senior Counsel
Scott W. Friestad
Associate Director
David Frohlich (DC Bar # 425928)
Assistant Director
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-5030
Tel. (202) 551-4556 (Direct)
margandc@sec.gov

Attorneys for Plaintiff